ANNIE S. HATCH vs. CHESTER F. DUTCH, Admr.

York.    Opinion June 30, 1915.

*Administration.    Appeal.    Claim.    Contract.    Gratuitous Services.    Implied
Promise.    Insolvency.    Presentation of Claim.    Probate Court.*

1.   It was incumbent upon the plaintiff in this case to satisfy the jury that the
     services sued for were rendered by her to her father under circumstances consis-
     tent with contract relations between them and that her father either expressly
     agreed to pay for the services, or that they were rendered by her in the expecta-
     tion and belief, at the time, that they were to be paid for, and that the circum-
     stances of the case and the conduct of her father justified such expectation, and
     that he so understood it, or that he had sufficient reason to believe that she
     expected to make him her debtor for the services.

2.   That the application by the administrator for commissioners to be appointed
     to determine the claim is an admission or waiver of the presentation of the
     claim to him in writing as required by statute.

3.   When valuable services are rendered by one person at the request, or with the
     knowledge and consent of the other, under circumstances not inconsistent with
     the relation of debtor and creditor between the parties, a promise to pay is
     ordinarily said to be implied between the parties.

4.   A promise to pay is ordinarily said to be implied by law on the part of him who
     knowingly receives the benefit of the services.

5.   If in a particular instance there is evidence arising from the situation, conduct,
     or family relation of the parties tending to show that the service was rendered
     without expectation of pecuniary payment, it cannot be said as a matter of
     law that a contract is implied on the part of him to whom the service is rendered
     to pay for it.

6.   When the relations of the parties are such as to warrant the inference that the
     services were rendered gratuitously, by way of hospitality, or by reason of any
     obligation, legal or moral, it becomes a question of fact for the jury to determine
     whether it was in reality gratuitous or rendered upon the basis of contract.

On motion for new trial by the defendant.    Motion overruled.

An action of assumpsit upon an account annexed to recover for
services rendered by plaintiff to her father in his house from April 6,
1904 to July 29, 1908, amounting to $1507.13, to which is added

interest amounting to $467.20. Plea—General issue, with brief statement alleging that plaintiff did not present her claim to the administrator of said estate, nor file same in Probate Court. The jury rendered a verdict for plaintiff for $529.39, and the defendant filed a motion for a new trial.

The case is stated in the opinion.

*Robert B. Seidel,* for plaintiff.

*E. P. Spinney,* for defendant.

SITTING: SAVAGE, C. J., SPEAR, CORNISH, KING, BIRD, HANSON, JJ.

KING, J. The plaintiff recovered a verdict of $529.39 against the estate of her father, Lincoln Hatch, for services rendered by her in his home from April 6, 1904 to July 29, 1908, and the case comes to this Court on the defendant's motion to have the verdict set aside as against the evidence.

The case shows that in April, 1904, Lincoln Hatch with his wife was living on his small farm in Wells, Maine. He was a carpenter by trade and worked chiefly at that occupation, nevertheless, he did some farming on his place, and kept a horse, three or four cows, and some hens. His six children, consisting of two daughters, Etta and Annie, and four sons, were grown up. Etta was then married and lived in Attleboro, Massachusetts, and Annie, the plaintiff, then 22 years of age, was also in Attleboro employed in a jewelry factory. Mrs. Hatch, the wife and mother, was sick of consumption from which she died January 5, 1905.

The plaintiff introduced evidence tending to show that on April 6, 1904, she left Attleboro and came to her father's home in Wells to do the housework and care for and nurse her mother, which she did until her mother's death on January 5 following; that thereafter she continued to live with her father in his house as his only housekeeper until July 29, 1908, when on account of illness she went to her sister's home in Attleboro; that during the time she so lived at her father's home she did the housework and such other labor as the only woman in such a home customarily does, including such chores about the place as were necessary to be done by her in her father's absences from home while working at his trade.

Her father died intestate January 10, 1910, and administration on his estate was granted to George S. Hatch July 19, 1910. An inven-

tory of the estate was accepted and filed May 2, 1911, showing real estate valued at $1600, but no personal property. December 19, 1911, upon the application of the administrator alleging that Annie S. Hatch had presented to him a claim against the estate which he deemed "exhorbitant, unjust or illegal," commissioners were appointed by the Probate Court under the statute to determine, what amount, if any, should be allowed on said claim. On January 16, 1912, the commissioners made their report allowing (including interest) $1620.77, which report was ordered accepted and recorded.

September 13, 1912, two of the sons of Lincoln Hatch petitioned the Probate Court to have its decree accepting the report of the commissioners annulled and reversed on the alleged grounds, that the claimant had neither presented her claim to the administrator in writing nor filed it in the Probate Court, supported by affidavit as required by the statute, and that the claim had been allowed by connivance and fraud between the administrator and the claimant, and without notice to the other heirs. Thereupon, after notice and hearing, the Probate Court revoked its previous order accepting the report, and ordered a new commission issued to the same persons "for a full hearing of the parties interested in said claim and in said estate, in order that said petitioners and all others interested in said estate may be given the opportunity to be heard before said commissioners." Such new commission was issued and on September 2, 1913, the commissioners made their report allowing on said claim (including interest) $1885.57. which report was ordered accepted and recorded. From that decision of the commissioners an appeal was taken by the administrator de bonis non of said estate, and this action was commenced by the claimant November 4, 1913.

1. At the trial it was claimed as a defense to the action that the plaintiff did not present her claim to the administrator in writing, or file it in the Probate Court, supported by affidavit as required by statute, before the administrator applied for the appointment of commissioners to determine the validity of her claim. But this Court held in *Whittier* v. *Woodward*, 71 Maine, 161, that the application of the administrator for the appointment of commissioners to determine the validity of a claim against the estate is an admission or waiver of the presentation of the claim to him. Moreover, in the case at bar, there was evidence sufficient to justify the jury in finding that the plaintiff did in fact so present her claim to the administrator. She so

testified, and produced in evidence what she identified as a copy of her claim in writing, subscribed and sworn to by her on May first 1911, and she testified that immediately thereafter she gave the original of that copy to the administrator.

2.   It is beyond doubt that the evidence fully justified the jury in finding that the plaintiff served her father as his only housekeeper for a period of more than four years, and that her labor in that service was of substantial value to him, for which she received no material pecuniary compensation.

When valuable services are rendered by one person at the request, or with the knowledge and consent of the other, under circumstances not inconsistent with the relation of debtor and creditor between the parties, a promise to pay is ordinarily said to be implied by law on the part of him who knowingly receives the benefit of the services. But if in a particular instance there is evidence arising from the situation, conduct or family relation of the parties tending to show that the service was rendered without expectation of pecuniary payment, it cannot be said as a matter of law that a contract is implied on the part of him to whom the service is rendered to pay for it.   And when the relations of the parties are such as to warrant the inference that the service was rendered gratuitously, by way of hospitality, or by reason of any obligation, legal or moral, it becomes a question of fact for the jury to determine whether it was in reality gratuitous or rendered upon the basis of contract. *Saunders* v. *Saunders*, 90 Maine, 284, and cases cited.

It was incumbent upon the plaintiff in this case to satisfy the jury that the services sued for were rendered by her to her father under circumstances consistent with contract relations between them, and that her father either expressly agreed to pay for the services, or that they were rendered by her in the expectation and belief at the time that they were to be paid for, and that the circumstances of the case and the conduct of her father justified such expectation, and that he so understood it, or that he had sufficient reason to believe that she expected to make him her debtor for the services.   That was the real issue involved in the trial.   And in the absence of any exceptions to the charge of the presiding Justice it is to be assumed that full and adequate instructions were given the jury to enable them to understand that issue and to appreciate the kind and degree of proof required to establish the plaintiff's claim against her father's estate.

Upon that issue the jury found in the plaintiff's favor, and their finding should not be set aside unless it is so clearly wrong as to compel the conclusion that it was the result of prejudice or bias, or a failure to comprehend the facts and the legitimate inferences to be drawn therefrom.

The plaintiff was a witness in her own behalf, without objection, to matters relating to her claim happening before her father's death. She testified that she left Attleboro and went to her father's home in April, 1904, in response to his request contained in a letter from him to her, which had been destroyed, in which he asked her to come home and care for her mother and do the work, and "that I should be paid for it if I came down." Her sister Etta testified that she saw the letter and that the father therein requested the plaintiff to come home and take care of her mother. Etta also testified, that on the 4th of July of the year the plaintiff went home, when the witness was visiting her parents, her father in conversation with her about Annie said "that she should have her pay for coming home and taking care of them." That in another conversation with her father, around Christmas time of the same year, "He said she should have her pay for it." John W. Shuler, husband of Etta, testified that in July, 1904, when he was at the Hatch homestead on his vacation, Mr. Hatch in a conversation with him said, "that Annie should be well paid for her work and all her duties down there and that he couldn't afford to hire anybody else outside of her, and the way she went down there and undertook to do it all, and he told me distinctly himself that she should be well paid for it." He testified that Mr. Hatch said substantially the same to him "The second year after that, I believe, during the 4th of July week."

On the other hand, it was contended in behalf of the defendant, that the plaintiff returned to her father's home in 1904 at her own suggestion and for her own benefit, and that she remained there with no expectation that she was to receive any other compensation than that of having the benefit of a home with her father and such money as he might give her from time to time or allow her to retain from the proceeds of the small farm. And in support of that contention there was testimony to the effect that the plaintiff stated at her brother's home in Lynn, when she was on the way home in 1904, that "she was sort of run down and that her work was slack and she thought she would take a trip home to recruit up," and that after

she came home she made similar statements to her brother. She denied the making of such statements. There was also testimony in behalf of the defendant that the plaintiff's father gave her small sums of money, and that she had more or less of the "egg money."

The plaintiff left her father's home a year and a half before his death and she admits that she never asked him for money "for myself." And there was evidence on the part of the defendant that immediately after the father's death a conference between all the heirs was had in which it was agreed that two of the brothers should sell and dispose of "all the hay, apples, potatoes, vinegar, hens, horse, cows belonging to the personal estate of said Lincoln Hatch" and with the proceeds thereof pay the expenses of his "last sickness and burial." And an agreement to that effect was introduced in evidence signed by the other four heirs, including the plaintiff.

There was also testimony in behalf of the defendant to the effect, that at that conference the plaintiff joined with the other heirs in the understanding that no administration on the father's estate was necessary, that his real estate would be divided equally among the heirs, and that she did not then intimate that she had any personal claim against the estate. And it was strongly urged at the trial that such conduct on her part indicates clearly that at that time she did not consider that she was a creditor of her father's estate for the services sued for. Such would undoubtedly be a fair inference from such conduct. But we find a sharp conflict in the testimony as to what the plaintiff did and said at that time. She admitted that, after her father's funeral, the paper authorizing the immediate sale of the personal property therein specified was sent to her in Massachusetts and signed by her, but she denied that she took any such part in the alleged conference as would indicate that she did not then have in mind her claim for services against the estate. Concerning the conference, and the written agreement which she signed, she testified on cross examination:

Q. You never authorized it? A. Can I say a word?

Q. Just answer my question. That doesn't answer all the questions you have asked me. Q. Was there some talk about that?

A. Among the rest of them. Q. You knew about it? A. They wouldn't let me say anything. Q. You didn't make any claim at that time before one of them that you had a claim against the estate did you? A. I said something was coming to me. Q. You said something was coming to you? A. Yes, sir.

The testimony of her brother-in-law tends to corroborate her contention that she took no material part in the talk as to an equal division of the estate among the heirs. On the other hand three of her brothers testified that she took part in the conference and made no suggestion that she expected compensation for services rendered her father. And there was other evidence which the defendant claimed tended to disprove her testimony on this point.

It is thus seen, that there was a sharp conflict between the testimony of the plaintiff and her witnesses, and that presented in behalf of the defendant. The jury, evidently, was more impressed by the former. The credibility of witnesses and the weight to be given to their testimony is peculiarly within the province of the jury; and although, if we were sitting as jurors, we might reach a different conclusion from that of the jury, yet we should not set their finding aside unless manifest error is shown, or it appears that the verdict was the result of bias or prejudice. The amount of the verdict does not indicate such bias or prejudice, for it is less than one-third of the smallest amount reported by the commissioners.

From a painstaking examination and consideration of all the evidence in the case we are not persuaded to the conviction that the verdict is so clearly wrong as to require the court to set it aside,

*Motion overruled.*